IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| DIANN TIPPINS ) | |
| ) | |
| and ) | |
| ) | |
| GENEVA HEARD ) | |
| ) | |
| Plaintiffs, ) | |
| v. ) | CASE NO.  3:13-CV-368-WKW |
| ) | [WO] |
| CITY OF DADEVILLE, ALABAMA, ) | |
| ) | |
| MAYOR MIKE INGRAM, *in his* ) | |
| *capacity as Mayor of Dadeville*, and ) | |
| ) | |
| SHARON HARRELSON, *in her* ) | |
| *capacity as an agent of the City of* ) | |
| *Dadeville*, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

Before the court is Defendant's motion for summary judgment.  (Doc. # 37.) Plaintiff responded in opposition (Doc. # 39), and Defendant replied (Doc. # 41). For the reasons that follow, the motion is due to be granted.

**I. JURISDICTION AND VENUE**

The court exercises jurisdiction pursuant to 28 U.S.C. § 1331.  The parties do not contest personal jurisdiction or venue.

## II.  STANDARD OF REVIEW

To succeed on summary judgment, the movant must demonstrate "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he court must view the evidence and the inferences in the light most favorable to the nonmovant." *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for the motion." *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). This responsibility includes identifying the portions of the record illustrating the absence of a genuine dispute of material fact. *Id.* Or a movant who does not have a trial burden of production can assert, without citing the record, that the nonmoving party "cannot produce admissible evidence to support" a material fact. Fed. R. Civ. P. 56(c)(1)(B); *see also* Fed. R. Civ. P. 56 advisory committee's note ("Subdivision (c)(1)(B) recognizes that a party need not always point to specific record materials. . . . [A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact.").

If the movant meets its burden, the burden shifts to the nonmoving party to establish—with evidence beyond the pleadings—that a genuine dispute material to each of its claims for relief exists. *Celotex*, 477 U.S. at 324. A genuine dispute of

material fact exists when the nonmoving party produces evidence allowing a reasonable fact finder to return a verdict in its favor. *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001). On the other hand, "[i]f the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986).

"A mere 'scintilla' of evidence supporting the [nonmovant's] position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party," *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990), and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine dispute of material fact and do not suffice to oppose a motion for summary judgment. *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (*per curiam*). Hence, when a plaintiff fails to set forth specific facts supported by appropriate evidence sufficient to establish the existence of an element essential to his case and on which the plaintiff will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party. *Celotex Corp.*, 477 U.S. at 323.

### III.   FACTS[1]

On Memorial Day, Monday, May 30, 2011, Ian Tippins ("Ian"), the nineteen-month-old son of Plaintiff Diann Tippins ("Tippins"), died by accidental drowning in Milbrook, Alabama. (Doc. # 28-1 at 2; Doc. 37-1 at 6.) The Tippins family is African-American. On Wednesday, June 1, 2011, Ian's godmother, Plaintiff Geneva Heard, called the City of Dadeville and spoke with the City Clerk, Sharon Harrelson, to inform her that Tippins wanted a burial plot in the Dadeville Cemetery. (Doc. # 37-1 at 45.) Harrelson told Heard to come to City Hall the next day at 11:00 a.m. (Doc. # 37-1 at 45.)

At the appointed time on Thursday, June 2, 2011, four women – Tippins; Heard; Tippins's sister, Glenda Russell; and Tippins's coworker and friend, Almitra Ankton – arrived at Dadeville City Hall to inquire about the purchase of a burial plot for Ian in Dadeville Cemetery. (Doc. # 37-2 at 8; Doc. # 37-1 at 6-9.) Sharon Harrelson, the City Clerk, met with the four women to assist them with purchasing a plot in cemetery. (Doc. # 37-1 at 10.) In her job as City Clerk, Harrelson does not normally assist people with finding cemetery plots. (Doc. # 37-5 at ¶ 2.) She has limited personal knowledge of the cemetery, and she does not

---

[1] Defendants have presented evidence tending to contradict some of the facts set forth in this opinion. However, to the extent that a dispute exists as to any of the facts or evidence, all conflicts in the evidence have been resolved in Plaintiffs' favor, and the court has drawn all reasonable inferences from the evidence in the light most favorable to Plaintiffs. For purposes of summary judgment, disputed factual averments not supported by evidence have been disregarded. *See* Fed. R. Civ. P. 56(c) (setting for requirements for supporting and opposing a motion for summary judgment).

know who is buried where. (Doc. # 37-5 at ¶ 2.) However, Harrelson assisted the four women on that day because the city employee who typically dealt with matters concerning the cemetery had been reassigned to assist with cleanup from a recent tornado and was not available. (Doc. # 37-4 at 5.)

The Dadeville Cemetery has an old section and a new section. The old, original section of the cemetery dates back to the 1800s. (Doc. # 37-4 at 14.) The records for the old section of the cemetery are in "terrible shape." (Doc. # 37-5 at ¶ 2.) Some graves in the older section have no markers at all. (Doc. # 37-4 at 16.) Historically, black families were buried on one side ("the left side") of a fence in the old section the cemetery, and white families on the other side ("the right side"). (Doc. # 37-4 at 21.) At least some white people are buried on the left side. (Doc. # 37-4 at 13.) The right side is maintained better than the left side. (Doc. # 37-1 at 17-18.) By common practice among those familiar with the cemetery, the left side of the old section is commonly called "the black side," and the right side is commonly called "the white side." (See Doc. # 37-4 at 11; Doc. # 37-1 at 42-43; Doc. # 39-1 at ¶ 2. However, it is undisputed that Harrelson never referred to the left side as "the black side" or the right side as "the white side." (Doc. # 37-1 at 37.)

At some point prior to the time Harrelson began to work for the City of Dadeville, the City purchased the new section of the cemetery because the old

section had become overcrowded. (Doc. # 37-4 at 12.) Both black and white people were buried in the new section, and there is no evidence that the new section was ever segregated. (Doc. # 37-1 at 43; Doc. # 37-4 at 11-12.)

At City Hall, Harrelson showed the four women a map or book[2] of the cemetery, but, because Tippins could not "tell anything" from the map or book, she wanted to go to the cemetery to pick out a plot. (Doc. # 37-1 at 10.) Tippins asked Harrelson if "it would be best if [the four women] just went on over to start looking, and [Harrelson] said yes and she would meet [them] over there." (Doc. # 37-1 at 10.) Before the women left, Harrelson remarked to Plaintiffs that it was not her job to help them and that she was supposed to be on her lunch break. (Doc. # 37-1 at 47.) At some point before driving to meet the four women at the cemetery,[3] Harrelson spoke with Al Ford, head of maintenance for the City of Dadeville and the father of Almitra Ankton, who informed her that Heard's family already had burial plots in the cemetery.[4] (Doc. # 37-4 at 7.) Ford asked Harrelson to help the Tippins family find a plot because the family had financial difficulties

---

[2] Tippins does not recall whether the material Harrelson showed her was a map or a book, and she does not remember what it looked like. The material was not in a format easily readable or understandable, and Tippins could not tell from the material what the available plots looked like or where they were located. (Doc. # 37-1 at 11-12.)

[3] The record on summary judgment does not make clear whether Harrelson spoke to Al Ford before the four women arrived at City Hall.

[4] Heard's family has a number of individual plots in left side of the old section of the cemetery. (Doc. 37-1 at 42; Doc. # 37-4 at 10.)

and had lost a child.  (Doc. # 37-4 at 7.)

After the four women left the meeting with Harrelson at City Hall, Heard drove them to the cemetery.  (Doc. # 37-1 at 10.)  When they arrived at the cemetery, they walked over to look at the graves of Queen Ester Rowe and her husband, Wilbert Rowe.  (Doc. # 37-1 at 5, 14-15.)  Heard was related to the Rowes, and Tippins had attended the Rowes' funerals as a friend of their family.  (Doc. # 37-1 at 5, 16.)

Harrelson arrived at the cemetery after the four women. She parked near Heard's car, and she met them where they were standing by the Rowes' graves.  (Doc. # 37-1 at 7, 16-17, 19, 47; Doc. # 37-4 at 8.)  The group then looked at several areas throughout the cemetery.  Harrelson had the map or book with her.  (Doc. # 37-1 at 17.)  Harrelson informed the women that plots were available in the area known as the new cemetery.  (Doc. # 37-2 at 11.)  However, Tippins was not interested in the new cemetery because the monument that she wanted would not be allowed in the new section.  (Doc. # 37-2 at 11.)  Tippins requested a plot in the right side of the older section of the cemetery.  (Doc. # 37-2 at 11.)  Harrelson told Plaintiffs that no plots were available on the right side.  (Doc. # 37-1 at 19, 21, 23.)

However, according to Tippins, after Harrelson stated that plots were not available on the right side, the group nevertheless continued to look for plots on the right side because "[Harrelson] was not 100 percent sure" whether plots were

7

available there, since she did not have "a map or anything" with her that would definitively "show whether [plots were] available or not." (Doc. # 37-1 at 20.)

While the group was looking for a plot, Harrelson was "helpful by trying to help [the four women] pick a spot," but she also made statements several times to the effect that helping the women was not her job, that it was hot out, and that it was her lunchtime. (Doc. # 37-1 at 47.) Harrelson smoked at the cemetery and did not offer words of condolence to Tippins. (Doc. # 37-1 at 50.) At her deposition, Heard opined that Harrelson's lack of friendliness could have been "just [her] personality." (Doc. # 37-1 at 46.)

Tippins decided that she wanted a plot in a certain shady area on the right side. (Doc. # 37-1 at 21.) Harrelson told Tippins that no plots were available in the shady area. (Doc. # 37-1 at 21.) According to Tippins, Harrelson then "went on to follow up with" the fact that she would have to check availability there and call them back. (Doc. # 37-1 at 21.) Heard asked if Harrelson could verify availability in the shady spot and call them back that afternoon. (Doc. # 37-1 at 21, 48.) Harrelson said that she could call them back the following day, but that would not work for Tippins, who needed to find a burial plot that day. (Doc. # 37-1 at 21, 48.) Despite Harrelson's offer to check and call her back, Tippins did not provide Harrelson a telephone phone number to call her back because, at that point, she "was done." (Doc. # 37-1 at 21-22.) However, Heard provided Harrelson her own

home telephone number. (Doc. # 37-1 at 22, 23-24).

The four women then left the cemetery. (Doc. # 37-1 at 24.) The last thing Tippins said to Harrelson before leaving was: "I have to lay my son to rest in two days. It's difficult enough. All I need is for you to help me." (Doc. # 37-1 at 24.) In the car, Tippins was upset and crying, and she told the other women that she could not believe what had just happened. (Doc. # 37-1 at 25.)

Upon departure from Dadeville, Plaintiff Tippins called a co-worker, who recommended two potential burial sites in the Alexander City area. (Doc. # 37-1 at 27-28.) Following that phone call, Tippins and Russell drove to Hillview Cemetery, one of the locations recommended by her co-worker. (Doc. # 37-1 at 28.) At Hillview Cemetery, Tippins found suitable burial plots for Ian, her husband, and herself, which she purchased at that time. (Doc. # 37-1 at 29.) By 3:30 in the afternoon that day, Tippins had purchased one of the plots. (Doc. # 37-1 at 42.)

Meanwhile, while Tippins was attempting to locate an alternative burial plot, Harrelson asked the mayor, Defendant Mike Ingram, to help her take a large map to the cemetery "to see if there was any way that [they] could find available space." (Doc. # 37-4 at 16.) Harrelson asked Mayor Ingram to assist because the map they needed to consult was so large that two people were required to carry and use it. (Doc. # 37-4 at 16-17.) Harrelson and Mayor Ingram determined that some

9

of the areas that had interested Tippins might be available. (Doc. # 37-4 at 16-17, Doc. # 37-5 at 2-3.) They then returned to City Hall to check deeds to confirm availability. (Doc. # 37-4 at 17.)

At around 3:35 p.m. that same day, Harrelson called Heard to tell her that several of the plots Tippins wanted were available after all. (Doc. # 37-1 at 42; Doc. # 37-2 at 13.) Mayor Ingram also spoke with Heard during that telephone conversation. (Doc. # 37-2 at 17.) Heard testified that, during the call, Mayor Ingram told her: "[d]own from the fence from the white side down through the black side over in the front of IGA, that spot y'all was looking at over there in the shaded area is available." (Doc. # 37-2 at 17.) Heard told Mayor Ingram and Harrelson that she would tell Tippins about the available plots and then call them back to let them know if Tippins still wanted a spot. (Doc # 37-2 at 19.)

Heard then called Tippins and explained that the plot in the shady spot on the right side of the cemetery was available for her to purchase. (Doc. # 37-2 at 19.) Tippins replied that she had already purchased a burial plot for Ian and was no longer interested in the plot in the Dadeville Cemetery. (Doc. # 37-2 at 19.) Shortly thereafter, Heard spoke to Mayor Ingram by telephone and told him that Tippins had already bought a burial plot for her son and would not need the one in Dadeville Cemetery. (Doc. # 37-2 at 20.) According to Heard, Mayor Ingram said he was "sorry. He wasn't smart or anything like that." (Doc. # 37-1 at 57.)

To Heard, the Mayor seemed sincere during the conversation. (Doc. # 37-1 at 57.)

## IV. PROCEDURAL HISTORY

On May 30, 2013, Tippins and Heard filed a complaint against the City of Dadeville, Alabama; Mayor Mike Ingram, in his official capacity as Mayor of Dadeville; and Sharon Harrelson, in her official capacity as an agent of the City of Dadeville. (Doc. # 1.) The complaint set forth six counts. In Count One, Plaintiffs alleged that Defendants discriminated against Plaintiffs and denied them accommodations on the basis of race in violation of 42 U.S.C. § 2000a by "refus[ing] to allow them to purchase a burial plot on the 'white side' of the cemetery . . . ." (Doc. #1 at 5; Doc. # 18 at 7.) In Count Two, Plaintiffs alleged that Mayor Ingram and Harrelson "conspired . . . for the purpose of depriving, either directly or indirectly, Plaintiffs . . . , who are African-Americans and part of a protected class, of the equal protection of the laws or of equal privileges and immunities," in violation of 42 U.S.C. § 1985. (Doc. # 1 at 6-7.) Counts Three, Four, Five, and Six were state-law claims for fraud, civil conspiracy, and intentional failure to provide services by a public utility, and the tort of outrage. Plaintiffs requested compensatory damages, punitive damages, and a declaratory judgment. (Doc. # 1 at 8-12.)

On June 24, 2013, Defendants responded with a motion to dismiss. (Doc. # 5.) On March 19, 2014, the court denied the motion as to Count One and granted

the motion as to all other counts. (Doc. # 18.)

On April 2, 2014, Defendants filed a second motion to dismiss, in which they argued that Count One was due to be dismissed on grounds that cemeteries are not a "place of public accommodation" as defined by 42 U.S.C § 2000a. (Doc. # 27.) The court construed the motion to dismiss as a motion for judgment on the pleadings and granted the motion without prejudice to Plaintiffs to amend the complaint on or before June 4, 2014. (Doc. # 27.)

On June 4, 2014, Plaintiffs filed an amended complaint asserting a single claim that they were discriminated against on the basis of race in violation of 42 U.S.C. § 1982 when they were denied the right to purchase a burial plot on the "white side" of Dadeville's public cemetery. (Doc. # 30.) On June 20, 2014, Defendants filed an answer to Plaintiffs' amended complaint. (Doc. # 31.)

On July 16, 2015, Defendants filed a motion for summary judgment. (Doc. # 37.) Defendants argue that Heard has no standing to sue under 42 U.S.C. § 1982. Defendants also argue that Tippins's claims are subject to summary judgment because she cannot produce evidence that her ability to purchase a cemetery plot was denied or hindered on the basis of race. Because the court concludes that these two arguments are well-taken, the court pretermits any discussion of all other arguments Defendants raise on summary judgment.

## V. DISCUSSION

### A. Heard Cannot Assert a Claim Under 42 U.S.C. § 1982.

Section 1982 grants "[a]ll citizens of the United States . . . the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. § 1982. There is no evidence that Heard's right to purchase real property was hindered in any way. Heard did not attempt to purchase a cemetery plot. Tippins was the only Plaintiff who sought to purchase a plot. (Doc. # 37-1 at 45.) Because there is no evidence that Heard's right to purchase property was impeded, she has no standing to assert a § 1982 claim, and she cannot establish an essential element of a § 1982 claim. Accordingly Defendants are entitled to summary judgment on Heard's § 1982 claim.[5]

### B. There Is No Evidence that Tippins's Right to Purchase a Cemetery Plot Was Impeded on the Basis of Race.

To prevail on a claim under 42 U.S.C. § 1982, Tippins must show that she was denied the ability to purchase a cemetery plot on the basis of her race. 42 U.S.C. § 1982; *see Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 413 (1968) ("Whatever else it may be, 42 U.S.C. § 1982 is not a comprehensive open housing law. . . . [§ 1982] deals only with racial discrimination."); *Lawrence v. Courtyards*

---

[5] Even if Heard had standing to raise a § 1982 claim, her claim would be subject to summary judgment for the same reason that Tippins's is: this record contains no evidence that racial animus on the part of any Defendant prevented the purchase of a cemetery plot.

*at Deerwood Ass'n, Inc.*, 318 F. Supp. 2d 1133, 1150 (S.D. Fla. 2004) ("To establish a prima facie case [of discrimination under § 1982], a plaintiff must allege facts to show that: (1) the plaintiff is a racial minority; (2) the defendant intended to discriminate on the basis of race; and (3) the discrimination concerned activities addressed in [§] 1982.").

Tippins alleges that the City, through Harrelson and Mayor Ingram, did not accommodate Tippins's request to purchase a cemetery plot in time for her to be able to make the purchase. (Doc. # 39 at 4.) The record confirms that Tippins could not purchase the plot she wanted in the Dadeville Cemetery because Harrelson and Mayor Ingram were unable to confirm the availability of the plot before Tippins found and purchased an alternative plot elsewhere. The record also confirms that Harrelson and Mayor Ingram were aware that a speedy confirmation was essential because Tippins needed to purchase a burial plot that day. For purposes of ruling on the summary judgment motion, the court will assume, without deciding, that the delay in confirming the plot was sufficient to constitute a deprivation of Tippins's right to purchase property. However, there is no evidence that either Harrelson or Mayor Ingram delayed the plot purchase – and thereby denied Tippins's right to purchase property – *on the basis of race*.

Taken in the light most favorable to Tippins, the record establishes that Harrelson was insensitive and rude to Tippins by failing to offer condolences,

commenting repetitively on the heat and her missed lunch break, and repeatedly reminding the women that it was not her job to help them, all while Tippins was freshly grieving the loss of her son. However, there is no evidence in this record that Harrelson's rudeness signaled a reluctance to assist Tippins with the purchase of the cemetery plot on the basis of her race or the race of her son. Section 1982 does not prohibit rudeness, even rudeness to a grieving mother; it prohibits denying a person the right to purchase property on the basis of race. 42 U.S.C. § 1982; *see Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004) ("[T]his Court has repeatedly stated that the civil rights laws were not intended to be a 'civility code.'").

There is evidence that, while the four women were at the cemetery, Harrelson did not immediately tell Tippins that she could have the plot she wanted on the right side. However, there is no evidence that Harrelson's failure to provide on-the-spot confirmation of availability of right side plots was the product of racial discrimination. Instead, the undisputed evidence establishes that Harrelson's initial failure and/or delay in agreeing to sell Tippins a plot was because, as a result of poor recordkeeping, confirmation would require Harrelson to do additional work to ensure that any promised plot was indeed available.

Tippins argues that racial animus is confirmed by the fact that, when Harrelson and Mayor Ingram called Heard to inform her that Tippins's desired plot

was available, Mayor Ingram used the terms "white side" and "black side" to describe the location of the plot. Tippins's argument fails for two reasons.

First, there is no evidence that Mayor Ingram's use of the terms "white side" and "black side" signaled racial animus or a refusal to sell a cemetery plot in any area of the cemetery on the basis of race. Mayor Ingram used the term while calling to confirm that Tippins *could* purchase a plot in the right side of the cemetery. Plaintiffs' own evidence establishes that the terms were historically and commonly used to describe different areas of the cemetery, and Plaintiffs themselves used the terms for that same convenient purpose. (*See* Doc. # 37-4 at 11 (Plaintiffs' attorney describing the left side and stating that "we will also for convenience call [the left side] the black side"); Doc. # 37-1 at 42-43 (Heard's deposition testimony that "you've got this fence going down through there, and this is the white side and this is the black side"; "that's how it's always been identified" by "pretty much everybody"; and "that's the way it's always been identified; I live in Dadeville"); Doc. # 39-1 at ¶ 2 (Tippins's affidavit stating that "[c]itizens around Dadeville refer to the left side of the [c]emetery as the 'black side' and the right side of the cemetery as the 'white side'").)

Second, there is no evidence that Mayor Ingram participated in or caused any delay in securing the plot; rather, Mayor Ingram's assistance enabled Harrelson to confirm availability that day. (Doc. # 37-4 at 16-17.) Thus, even if

Mayor Ingram held any racial animus, his racial animus in no way interfered with Tippins's purchase of the plot.

Because Tippins has provided no evidence to establish that she was prevented from purchasing a cemetery plot on the basis of race, Defendants are entitled to summary judgment on Tippins's claim.

## VI. CONCLUSION

Accordingly, it is ORDERED that Defendants' motion for summary judgment (Doc. # 37) is GRANTED.

Final judgment will be entered separately.

DONE this 31st day of March, 2016.

                                         /s/ W. Keith Watkins
                              CHIEF UNITED STATES DISTRICT JUDGE